**JAMAICA NUTRITION HOLDINGS, LTD., Plaintiff-Appellee,**

v.

**UNITED SHIPPING CO., LTD. and M/V EL ZORRO, its engines, tackle, apparel, furniture, etc., Defendants-Appellants.**

No. 80–3108.

United States Court of Appeals,
Fifth Circuit.
Unit A

April 24, 1981.

Rehearing Denied May 27, 1981.

G. Edward Merritt, New Orleans, La., for defendants-appellants.

Courtenay, Forstall & Grace, F. A. Courtenay, Jr., New Orleans, La., for plaintiff-appellee.

Before GOLDBERG, AINSWORTH and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A claim for contamination of a cargo of soybean oil during a voyage from Louisiana to Jamaica presents, in addition to issues concerning the sufficiency of the evidence, the necessity of resolving the method of computing damages due when a loss is repaired in another country, paid for in foreign currency, and the relative value of the dollar and the foreign currency fluctuates during the period in question.

A supplier of soybean oil chartered the M/V EL ZORRO to ship a load of oil from Louisiana to Jamaica. When the ship arrived in Jamaica, traces of molasses were discovered in the oil. These presumably resulted from the residue of an earlier cargo remaining in the vessel's pipes. The oil

was reprocessed and purified by the purchaser. Challenging the existence of an obligation to clean the vessel's pipes, the sufficiency of the proof of contamination and the amount of damages, the owner of the ship appeals the trial court's judgment in favor of the purchaser.

We conclude that the district judge correctly found that the owner of the vessel was obligated to make it seaworthy by properly cleaning the pipes, tanks and pumping apparatus. Further, he was not clearly erroneous in accepting plaintiff's proof of damages. Because the cost of reprocessing the oil was incurred in Jamaican dollars, he calculated the equivalent value in United States dollars on the date the cargo was delivered although the Jamaican currency was later devalued. Finding no justification in theory or precedent to visit the risk of devaluation on the injured party, we hold that the conversion into United States dollars should be computed at the exchange rate in effect on the date the loss was incurred and the cost of reprocessing paid.

## I.

On November 12, 1977, Jamaica Nutrition Holdings, Ltd. (JNH) purchased 500 metric tons of fully refined soybean oil from Pasternak, Baum International, Inc. Pasternak chartered the M/V EL ZORRO from United Shipping to transport the oil from Louisiana to Kingston, Jamaica.[1] JNH, pursuant to a continuing contractual relationship, sold the oil to Seprod, a processor of soybean oil in Jamaica. Before the ship left Louisiana, a surveyor visually inspected the shore pipelines and the vessel's tanks on behalf of the charterer. He found the inspected facilities suitable for carrying the oil.

When the oil was loaded into the vessel's tanks at St. Rose, Louisiana, it was, according to an on-board bill of lading, in good condition. Upon the ship's arrival in Kingston, a Seprod employee and another surveyor examined the oil and found that it smelled and tasted sweet and had a greyish-brown cast. Further tests confirmed that the color and taste were attributable to a small amount of molasses mixed with the oil. This contamination resulted from failure to clean adequately the vessel's tanks, pipes and pumps after the immediately preceding voyage, on which the EL ZORRO carried a cargo of molasses. The district court found that the failure rendered the vessel unseaworthy.

After the oil was removed from the ship and stored briefly in dockside tanks, Seprod reprocessed the shipment and restored it to marketable condition. Approximately four months later, in April 1978, Seprod charged $45,206 Jamaican dollars to JNH[2] for these services and was subsequently paid in full. The district court, after disallowing a small amount of overhead expense found to be unreasonable, decided that the damage amounted to 44,636 Jamaican dollars, and held that the sum due should be converted into United States dollars at the rate prevailing on the date the cargo was delivered to Jamaica.

## II.

■ United's claim that JNH failed to prove by a preponderance of the evidence that the soybean oil was "not sufficiently contaminated"[3] need not detain us long. The district judge found that the oil "was contaminated by molasses that remained in

---

1. The parties differ on whether their agreement constituted a charter of the vessel or whether it related only to a portion of the vessel's capacity. In view of the conclusion we reach concerning the applicability of COGSA, resolution of this difference is unnecessary.

2. While there is evidence in the record that JNH controlled Seprod, there is nothing to indicate that the two corporations dealt with each other at less than arm's length.

3. In addition to arguing that the tests performed by Seprod were insufficient to prove contamination, United maintains that the initial contamination was aggravated by the temporary storage of the oil in a dockside tank that contained residue of once refined soybean oil. There was no proof, however, that this storage caused any extra reprocessing costs.

the pipes, valves and pumps from the previous voyage of the M/V EL ZORRO." An examination of the record fails to convince us that the judge was clearly erroneous in reaching that conclusion. Rule 52(a), Fed. R.Civ.P.

## III.

■ United maintains that it had effectively limited its liability by adding a clause to the charter party reading, "Vessel to clean tanks, lines and pumps *to Charterer's surveyor's satisfaction.*" (Emphasis supplied) Because a surveyor inspected the vessel's tanks and found them suitable, United argues that the vessel's obligation was fulfilled. However, the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1300–1315, was incorporated into the charter party by including a "U.S.A. Clause Paramount." That clause provides that any term in the charter party that is "repugnant to [COGSA] to any extent" shall be void.

COGSA, whether applicable by its own force or by virtue of the clause paramount, imposed a nondelegable duty on United to exercise due diligence to make the vessel fit for carriage of the cargo shipment. *See, e. g., California and Hawaiian Sugar Refining Corp. v. Winco Tankers, Inc.,* 278 F.Supp. 648 (E.D.La.1968). *See also* 46 U.S.C. § 1303. This duty was not abrogated by its covenant also to clean the vessel to the charterer's satisfaction.[4] By permitting molasses residue to remain in the system, United violated its duty. Therefore, we affirm the district court's conclusion that the defendants failed to fulfill their obligation to provide a seaworthy vessel and are liable to JNH for the damages caused.

## IV.

■ The proof of the exact amount of damages that Seprod and, in turn, JNH incurred, consisted of the testimony of Seprod employees who possessed either accounting or technical experience. The district court's examination of the expenses Seprod charged to JNH resulted in a minor disallowance of some supervisory salaries. United argues that there was a total absence of proof of the remaining overhead costs and that there was also insufficient proof of the costs of reprocessing. Although recognizing that an allocation of some overhead expenses is justified, United objects particularly to the amount approved as reasonable by the district judge.

The evidence was not of the first water and the data introduced left the issue of damages cloudier than it should have been. Yet there was nothing to the contrary. It was clear that reprocessing was needed and that the cost was substantial. After a thorough examination of the record, therefore, we are not left with a firm and definite conviction that the district court incorrectly computed the amount due. *See Harrison v. Flota Mercante Grancolombina, S.A.,* 577 F.2d 968, 974 (5th Cir. 1978). Therefore, we affirm in full the district court's finding of damages caused and costs incurred in Jamaican dollars. We are left only with the question of the proper rate at which to convert this amount into United States dollars.

## V.

■ The Jamaican dollar was valued at $1.12 United States dollars when the cargo was delivered. It was later devalued and, on the date of final judgment, was worth $0.47. The district court held that the conversion into United States dollars[5] should be computed at the rate of exchange that was in effect on the date the cargo was delivered. The jurisprudence charts provided by the parties give us little guidance in plotting a course. We have, however, reconnoitered independently, and, modifying the district court's conclusion, we hold that

---

4. "COGSA allows a freedom of contracting out of its terms, but only in the direction of *increasing* the shipowner's liabilities, and never in the direction of *diminishing them.* G. Gilmore & C. Black, The Law of Admiralty 145 (2d ed. 1975).

5. A money judgment entered by an American court must be in United States currency. *See, e. g., Frontera Transportation Co. v. Abaunza,* 271 F. 199, 202 (5th Cir. 1921).

the proper rate of exchange is the one prevailing at the time Seprod paid for the reprocessing.[6]

The Supreme Court first considered the proper date to compute the value in United States dollars of damages incurred in foreign currency in *Hicks v. Guinness*, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925). In that breach of contract case, it held that a debt payable in German marks should be converted into dollars at the rate prevailing on the date the contract in question was breached. Justice Holmes, writing for the Court, reasoned that at the time "the contract was broken . . . the American firm had a claim . . . for damages in dollars." *Id.* at 80, 46 S.Ct. at 47. If, however, a suit is based on an obligation existing under the laws of a foreign country and the debt is payable in that country's currency, then the parties take the risk of currency fluctuations and the judgment is converted into United States dollars on the date of the final decree. *Die Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926).

The breach of the duty to make the EL ZORRO seaworthy, while delictual in nature, is imposed as a result of the incorporation of COGSA into the charter party. Therefore, we look to the considerable body of precedent, involving this issue in maritime tort cases, only for such analogy as it may provide.

In dicta concerning tort cases in *Hicks*, the Court observed that the "loss for which the plaintiff is entitled to be indemnified . . . happens . . . when a tort is committed, and the plaintiff's claim is for the amount of that loss valued in money at that time." *Id.* 269 U.S. at 80, 46 S.Ct. at 47. Although this court has apparently never considered the proper date for the currency conversion in a tort action, the Supreme Court's dicta has been repeatedly interpreted by other courts in a variety of circumstances. *See, e. g., Bamberger v. Clark*, 390 F.2d 485 (D.C. Cir.1968); *Comte v. Flota Mercante del Es-*

*tado*, 1960 A.M.C. 1075, 1083–85 (2d Cir. 1960); *Skibs A/S Gylfe v. S/S Trujillo*, 1954 A.M.C. 233, 234–37 (2d Cir. 1954); *Shaw, Savill, Albion & Co. v. The Fredericksburg*, 189 F.2d 952 (2d Cir. 1951); *The West Arrow*, 80 F.2d 853 (2d Cir. 1936); *Laminoirs—Trefileries—Cableries de Lens, S.A. v. Southwire Co.*, 484 F.Supp. 1063, 1070 (N.D.Ga.1980); *B. V. Bureau Wijsmuller*, 1979 A.M.C. 2331, 2361–66 (S.D.N.Y.1979) (principles discussed in the context of a salvage case); *Holzman v. S.S. Hellenic Sunbeam*, 1977 A.M.C. 1731, 1732–33 (S.D. N.Y.1977); *Yeramex International v. S.S. Tendo*, 1977 A.M.C. 1807, 1838 (E.D.Va. 1977); *Eagle Oil & Shipping Co., Ltd. v. Tug Jim Brown*, 1952 A.M.C. 1395, 1398–99 (S.D.Tex.1952); *Quevilly v. Sampson*, 1938 A.M.C. 347, 354–56 (S.D.N.Y.1938); *Indemnity Mutual Marine Assurance Co. v. United States*, 1935 A.M.C. 809, 811–14 (S.D.N.Y.1934).

The Second Circuit has drawn a distinction between cases in which the tort occurs in a foreign country and the right to recover is, therefore, governed by foreign law and those in which the tort occurs in the forum and tort liability is governed by the law of the forum. In the former circumstance, damages incurred in foreign currency are converted into United States dollars at the rate prevailing on the date of the final degree. *See, e. g., Comte v. Flota Mercante del Estado*, 1960 A.M.C. 1075, 1083–84 (2d Cir. 1960). *Cf. Die Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926) (damages caused by the breach of an obligation, payable in terms of a foreign currency, that arises from the law of that country is to be converted into United States dollars on the date of the final decree). If the cause of action is governed by the law of the forum, however, the Second Circuit, following the *Hicks* tell-tale, has held that the applicable rate is the one prevailing on the date the cause of action arises. *Shaw, Savill, Albion & Co. v. The Fredericksburg*,

---

**6.** The evidence was based on the cost to Seprod. Seprod billed its related corporation JNH for only actual cost. Therefore, this amount is, in effect, the amount of loss actually paid by JNH.

189 F.2d 952 (2d Cir. 1951). Without any apparent intention to draw a distinction, this has also been described as the date the loss is suffered, *Indemnity Mutual Assurance Co. v. United States,* 1935 A.M.C. 809 (S.D.N.Y.1934), or the date on which the cost of repairs is paid, *Skibs A/S Gylfe v. S/T Trujillo,* 1954 A.M.C. 233, 235–36 (2d Cir. 1954). This rule has been applied in admiralty cases whether the tort occurs in United States waters or on the high seas because in both situations United States law governs the cause of action. *See, e. g., The Verdi,* 268 F. 908 (S.D.N.Y.1920); *Hawaiian-Larchgrove,* 1935 A.M.C. 809 (S.D.N.Y.1934).[7] Although this case is for breach of the contract between the parties, not a tort action arising under the general maritime law, United States law governs and we conclude that the same principles apply.

United argues that computing the conversion at a date earlier than the judgment day is unjust because this suit could have been brought in Jamaica and any judgment rendered there could have been paid in Jamaican dollars. There is, however, nothing of record that indicates the Jamaican courts could have obtained jurisdiction in this case.[8] Jurisdiction in the United States courts was obtained, even if only at the plaintiff's option.[9] JNH's claim for unseaworthiness arose under COGSA and was, therefore, plainly governed by the law of the United States as interpreted by the courts of the forum. When the charter party was breached by the failure to make the vessel seaworthy, JNH had a claim for damages in dollars. *Hicks v. Guiness,* 269

U.S. 71, 46 S.Ct. 46, 47, 70 L.Ed. 168 (1925). Only the exact amount of those damages remained to be calculated. Therefore, because the breach of the duty imposed by COGSA occurred when the vessel "broke ground" in Louisiana, *Horn v. Cia de Navegacion Fruco, S.A.,* 404 F.2d 422 (5th Cir. 1968), *cert. denied,* 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969), and the cause of action arose under United States law, damages should be converted into United States dollars on the date the reprocessing costs were incurred, and Seprod paid for them, in Jamaica.[10] *See Skibs A/S Gylfe v. S/S Trujillo,* 1954 A.M.C. 233 (2d Cir. 1954). *See also Wichita Mill & Elevator Co. v. Naamlooze Industries,* 3 F.2d 931, 933 (5th Cir. 1925); *Celia and Voltino* 2 A.C. 544 (1921) (same rule applied in England). We see no reason to place the risk of devaluation on (or to grant the possibilty of profit by appreciation to) the injured party.[11]

Accordingly, we AFFIRM the judgment of the district court in part, MODIFY it in part and REMAND for a recomputation of the amount of damages expressed in United States dollars.

**7.** *See also* 40 Harv.L.Rev. 619, 625 (1927).

**8.** In rem jurisdiction might have been obtained had the loss been discovered before the vessel's departure.

**9.** Although jurisdiction in the United States may not have been exclusive, it cannot be said that any other court has a superior jurisdictional base. *See Compaign Martime Normande v. United States,* 1938 A.M.C. 347, 354 (S.D.N.Y. 1937).

**10.** We express no opinion concerning the propriety of drawing a distinction between a foreign tort and a tort governed by United States law. Nor would our conclusion necessarily be the same if there were evidence of manipula-

tion by the injured party to obtain a favorable rate by delay. Damages must, of course, be mitigated.

**11.** *Compare Skibs A/S Gylfe v. S/T Trujillo,* 1954 A.M.C. 233, 236 (2d Cir. 1954) ("It is fairer to put the risk of fluctuation of foreign currency on the tortfeasor than on the innocent injured party.") *with Die Deutsche Bank Filiale Nurnberg v. Humphrey,* 272 U.S. 517, 519, 47 S.Ct. 166, 167, [71 L.Ed. 383] (1926) ("An obligation in terms of the currency of a country takes the risk of currency fluctuations and whether creditor or debtor profits by the change the law takes no account of it.")