[No. 27520-8-I.   Division One.   April 20, 1992.]

AKER VERDAL A/S, ET AL, *Respondents*, v. NEIL F. LAMPSON, INC., *Defendant*, MANITOWOC COMPANY, INC., ET AL, *Appellants*.

*A. Richard Dykstra* and *Stafford Frey Cooper & Stewart,* for appellants.

*Richard C. Coyle, J. Christian Moller,* and *Perkins Coie,* for respondents.

AGID, J. — Plaintiffs Aker Verdal A/S and A/S Factoring Finans (Aker), Norwegian corporations, sued defendant Manitowoc Company, Inc. (Manitowoc), a Wisconsin corporation, to recover damages caused by the collapse of a crane. Manitowoc appeals the trial court's judgment in favor of Aker, contending that the court erred in admitting certain evidence, in applying the currency exchange rate in effect when Aker filed its complaint, and in awarding prejudgment interest on a portion of the jury's award. Aker cross-appeals, challenging the trial court's exchange rate and prejudgment interest rulings. We affirm in part and reverse in part.

## I
### FACTS

Aker manufactures large oil drilling platforms. As part of its operations, Aker used a large "Transi-Lift" crane at its jobsite in Verdal, Norway. On September 4, 1986, a portion of the crane boom collapsed. Manitowoc designed and manufactured a component of the crane, the failure of which caused the crane's collapse. Aker incurred damages for the costs of repairing the crane as well as consequential damages resulting from its inability to fully operate the crane for several months. Aker's repair costs included the cost of parts purchased from the designer and assembler of the crane, Neil F. Lampson, Inc. (Lampson). Because of its expertise in the welding and fabrication of heavy steel structures, Aker did the repair work itself with technical assistance from Lampson. Aker thus incurred labor and material costs over and above the cost of parts purchased from Lampson.

In 1988, Aker sued Manitowoc and Lampson to recover its repair costs and consequential damages. On October 15, 1990, the jury found Manitowoc liable and assessed it with 43 percent of the total fault for the accident. Lampson was found 20 percent at fault, and Aker 37 percent.[1]

## II
### DISCUSSION

A. Discovery Sanction.

On the first day of trial, Manitowoc moved in limine to exclude documents it received just 3 days earlier which supported Aker's claim for consequential damages. The documents were monthly progress reports used by Aker's accounting expert to calculate its consequential damages. Although Aker used the documents to support its expert's opinion, it did not offer them into evidence.[2]

■ On appeal, Manitowoc relies on an oral request made during a deposition as the basis for its argument that the documents should have been excluded because they were not timely produced. The deposition notice had requested that Aker produce a witness to testify to its itemization and calculation of all damages, including consequential damages. During the deposition of that witness, Svein Erik Hegdal, Manitowoc asked Aker whether it planned on "introducing into evidence at trial any documents pertaining to economic loss that we have not had produced here in conjunction with the discovery requests and the depositions?" Aker's counsel

---

[1]Aker settled its claim against Lampson before trial.

[2]At trial, Manitowoc contended that Aker failed to timely produce these documents despite Manitowoc's request for them 6 months before trial in its second request for production of documents. Manitowoc argued that a written interrogatory encompassed documents relating to both repair costs and consequential damages. The trial court analyzed the language of the interrogatory and concluded that the request applied only to damages for costs of repair. No other interrogatory asked for documents relating to consequential damages. Therefore, the court ruled that Aker had not violated the discovery rules. At oral argument, Manitowoc conceded that it was not relying on the written request as a basis for its contention that the trial court erred in admitting the documents used by Aker to support its claim for consequential damages. We therefore do not address the written request on appeal.

responded, "Well, I think that in connection with the consequential damages, at this time, I don't anticipate using additional documents." In arguing to the trial court that it should exclude evidence of the belatedly produced documents, Manitowoc's counsel neither mentioned nor relied on the oral inquiry.[3] Because Manitowoc did not rely on the oral inquiry at trial, it is precluded from raising it on appeal. *E.g.*, *Wilson v. Steinbach*, 98 Wn.2d 434, 440, 656 P.2d 1030 (1982).

■ Even if we were to review the alleged error based on the oral inquiry, we would find that Manitowoc's position lacks merit. The general rule is that "a trial judge should not exclude testimony absent a showing of intentional or tactical nondisclosure, willful violation of a court order, or other unconscionable conduct." *Alpine Indus., Inc. v. Gohl*, 30 Wn. App. 750, 760, 637 P.2d 998, 645 P.2d 737 (1981), *review denied*, 97 Wn.2d 1013 (1982).

■ CR 26(e)(2) provides:

> A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
>
> . . . .
>
> (2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

Although this rule does not expressly require that the prior request or response be in writing, the discovery rules do require that a request for production of documents be served on the opposing party. This language strongly implies that such a request must be written. We hold that, in the absence

---

[3]Manitowoc did attach the deposition excerpt to counsel's affidavit in support of his oral motion to exclude the documents from evidence. The relief requested in that affidavit, however, was limited to exclusion of a different set of documents that were not produced until September 18. The affidavit was signed September 24, 1990, 4 days before the documents at issue were furnished to Manitowoc. Thus, the trial judge had no way of knowing that the oral inquiry attached to counsel's affidavit might be relevant to Manitowoc's motion to exclude the documents produced on September 28.

of a written discovery request, a party is not obligated to supplement his or her response to an inquiry. In so holding, we do not condone intentional nondisclosure or attempts to evade the discovery rules. Further, we believe that attorneys should be able to rely on oral representations of counsel.

In this case, however, even if we were to assume that Manitowoc's request was in writing because it was made at a deposition and the testimony was later transcribed, the request was only for documents which Aker intended to offer into evidence. Aker did not in fact offer the documents into evidence, but used them as one of the bases for its expert's opinion. There was therefore no requirement that Aker supplement its original answer to Manitowoc's request for documents because that request was limited to documents Aker planned to introduce into evidence.

B. Applicable Exchange Rate.

Aker incurred most of its repair costs, other than the costs reflected in the Lampson invoices, and its consequential losses in Norwegian kroner. The trial court's award of damages for these losses raised the issue of which date should be used to convert the damages computed in kroner to dollars. Manitowoc requested the court to apply the exchange rate in effect on the date of loss: 7.28 kroner to the dollar. Aker argued that, because the dollar had steadily depreciated from the date of loss, applying any rate other than the rate in effect at the date of judgment would not make Aker "whole". It therefore asked the court to apply the exchange rate in effect at the date of judgment, approximately 6.0 kroner to the dollar, which would yield a damage award equivalent to the kroner it lost.[4] The trial court took a middle-ground position, instructing the jury to convert the damages computed in kroner into a dollar amount using the exchange rate effective when Aker filed its complaint against Manitowoc. At that time, the exchange rate was 6.65 kroner to the dollar. Both parties appeal the trial court's

---

[4] Aker alternatively requested the trial court to award the judgment in kroner.

decision to use the exchange rate in effect when the complaint was filed.

■ The guiding principle of tort law is to make the injured party as whole as possible through pecuniary compensation. *DeNike v. Mowery*, 69 Wn.2d 357, 371, 418 P.2d 1010, 422 P.2d 328 (1966). Manitowoc does not dispute the fact that, since Aker must convert the judgment proceeds into kroner to replace the kroner it lost, it will not be fully compensated for its actual losses unless the exchange rate at the time of judgment is applied. Nevertheless, Manitowoc cites several cases that it believes support its position that the date-of-loss rate should be used. *Glaspey v. Prelusky*, 36 Wn.2d 592, 219 P.2d 585 (1950); *Church Mfg. Co. v. American Sec. Bank*, 130 Wash. 575, 228 P. 518 (1924); *Brougham v. Swarva*, 34 Wn. App. 68, 661 P.2d 138 (1983). However, those cases merely hold that the correct measure of damages in cases involving stolen or destroyed property is the property's fair market value at the time of conversion or injury. That measure of damages was applied in this case: the cost of repairs and other losses was determined on the basis of their cost at the time of the accident. Which exchange rate should be applied to convert the judgment from dollars to kroner is an entirely different issue. Although Aker avoided fluctuations in the cost of materials and labor by repairing the crane immediately after the accident, fluctuations in currency values were beyond its control.

■ The American Law Institute has adopted the following approach to the issue of which conversion rate should be applied in converting foreign currency to American dollars:

> c. *Making the injured party whole.* The objective of civil money judgments is, in general, to place the judgment creditor (*i.e.*, the injured party) in a position as close as possible to that in which he would have been if the obligation had been carried out by the judgment debtor or if the injury had not occurred. When obligations are incurred in currencies other than the currency of the forum, the same objectives govern. While the preference of the judgment creditor is to be taken

*into account, the decision is to be made by the court, which should assure that neither party receives a windfall or is penalized as a result of currency conversion. If the court gives judgment in United States dollars, as is the general practice, the date used for conversion should depend on whether the currency of obligation has appreciated or depreciated relative to the dollar. In general, if the foreign currency has depreciated since the injury or breach, judgment should be given at the rate of exchange applicable on the date of injury or breach; if the foreign currency has appreciated since the injury or breach, judgment should be given at the rate of exchange applicable on the date of judgment or the date of payment.*

(Italics ours.) Restatement (Third) of Foreign Relations Law of the United States § 823, comment *c* (1987). We believe that the Restatement rule is the only approach which furthers the prevailing principle of tort litigation, *i.e.*, to make the plaintiff whole for the damages suffered at the hands of the defendant. Under this approach, the trial court should have used the rate effective on the date of judgment because the dollar had depreciated against the kroner.

Courts from several jurisdictions have recognized that selecting the conversion rate that will make the injured party whole is the only equitable approach. *El Universal, Compania Periodistica Nacional, S.A. de C.V. v. Phoenician Imports, Inc.*, 802 S.W.2d 799 (Tex. Ct. App. 1990); *Teca-Print A.G. v. Amacoil Mach., Inc.*, 138 Misc. 2d 777, 525 N.Y.S.2d 535 (Sup. Ct. 1988); *B.V. Bureau Wijsmuller v. United States*, 487 F. Supp. 156 (S.D.N.Y. 1979), *aff'd*, 633 F.2d 202 (2d Cir. 1980). In *Teca-Print*, a Swiss manufacturer sued an American company for failure to pay invoices billed in Swiss francs. Because the United States dollar had depreciated in relation to the Swiss franc between the date of breach and the date of judgment, the court concluded that it should apply the rate in effect on the date of judgment. *Teca-Print*, 182 Misc. 2d at 783-85. The court observed that there was no strict rule requiring use of the breach date in currency conversions in New York State. Rather, "the courts have consistently looked at the surrounding circumstances to reach a just and equitable result." 182 Misc. 2d at 784. Because American courts are unable to render judgments in

foreign currency and because the dollar has declined as the universal currency standard, the court questioned the continued validity of the breach-date rule upon which Manitowoc asks us to rely. 138 Misc. 2d at 781-84. The court therefore selected a conversion date, which "under the particular circumstances of the case, affords a fair and equitable result." 138 Misc. 2d at 785.

Applying the Restatement approach, the court in *El Universal* reached the same conclusion. El Universal, a Mexican corporation, sued a Texas corporation to recover an unpaid debt. The trial court awarded a judgment in Mexican pesos. Although the peso had depreciated in relation to the United States dollar, the trial court applied a date-of-judgment exchange rate. Noting that the objective of civil money judgments is to place the judgment creditor or injured party in the position he or she would have been in had the breach or injury not occurred, the court held that the trial court should have applied the date-of-breach conversion rate because that would have fulfilled the "make-whole" objective. *El Universal*, 802 S.W.2d at 803-04. In emphasizing the goal of making the injured party whole, these cases reflect a well-reasoned and equitable approach to deciding the conversion rate issue.

Manitowoc cites two federal cases which it believes compel this court to apply the date-of-loss conversion rate. *Jamaica Nutrition Holdings, Ltd. v. United Shipping Co.,* 643 F.2d 376 (5th Cir. 1981); *In re Good Hope Chem. Corp.,* 747 F.2d 806 (1st Cir. 1984), *cert. denied,* 471 U.S. 1102 (1985). In *Jamaica Nutrition Holdings,* a buyer of soybean oil which was contaminated during shipping sued the owner of the shipping vessel to recover the cost of reprocessing the oil. The reprocessing cost was incurred in Jamaican dollars. Between the date of loss and the date of judgment, the Jamaican currency had depreciated. Relying on old United States Supreme Court precedent, the court concluded that the date-of-loss exchange rate should be used to convert the damages into United States dollars. 643 F.2d at 380-81.

The *Jamaica Nutrition Holdings* court believed that the Supreme Court's decisions in *Hicks v. Guinness*, 269 U.S. 71, 70 L. Ed. 168, 46 S. Ct. 46 (1925) and *Die Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 71 L. Ed. 383, 47 S. Ct. 166 (1926) dictated the result it reached. In *Hicks*, the Court held that a debt payable in German marks should be converted into United States dollars using the exchange rate in effect on the date of breach. The rationale was that, because the breach occurred in the United States, the debt became an American debt at the time of breach and should therefore be converted into dollars using the rate in effect at that time. *Hicks*, 269 U.S. at 80. In *Die Deutsche Bank*, by contrast, the claim was based on an obligation existing only under foreign law, and the debt was payable in foreign currency. The Court held that under those circumstances, the date-of-judgment rate should be used. 272 U.S. at 518-19. Thus, from these cases the rule evolved that, when a tort occurs in this country and liability is governed by American law, the date-of-loss conversion rate should be used. When, however, the tort occurs in a foreign country, and the claim arises under foreign law, the date-of-judgment rate applies. *Jamaica Nutrition Holdings*, 643 F.2d at 380.

The difficulty with applying this rule to present-day litigation, however, is that the distinction made in *Hicks* and *Die Deutsche Bank* is no longer viable. As this case demonstrates, the courts do not always apply the law of the forum in which the tort occurred. Here, the tort occurred in Norway but the court applied Washington law to decide the merits.[5]

More importantly, many courts have determined that the overriding concern is to reach an equitable result, which cannot be achieved through the application of a rigid rule. *E.g., Teca-Print*, 138 Misc. 2d at 781-84. This concern is reflected in the court's decision in *Jamaica Nutrition Holdings*. Although the court purportedly relied on the *Hicks*

---

[5]The choice of law issue apparently was not before the trial court. Neither party argued that Norwegian law should be applied.

rule, it reached a fair and equitable result by using the date-of-breach exchange rate. Because the Jamaican currency had depreciated, this rate most fully and fairly compensated the injured party. As the court stated in conclusion, "[w]e see no reason to place the risk of devaluation on (or grant the possibil[i]ty of profit by appreciation to) the injured party." 643 F.2d at 381.

In *Good Hope Chemical*, the parties to a breach of contract action, a Texas corporation (and the Chapter 11 debtor) and a West German manufacturer, agreed that the creditor's claim was governed by American law. Under *Hicks* and *Die Deutsche Bank*, the court felt compelled to apply the exchange rate in effect on the date of breach. Because the United States dollar had depreciated in relation to the German mark since the date of breach, application of that exchange rate put the loss on the nonbreaching party. The court stated:

> The object of the breach day rule is to restore the plaintiff to the position he would have enjoyed had the contract not been breached. The breach day rule, however, may fail to fully compensate plaintiffs like K & L who would have retained the foreign currency, which appreciated in value relative to the dollar, had the agreement been performed. To put K & L as nearly as possible in the position it would have enjoyed had the contract not been breached, we would have to use the judgment day rate of exchange, a result not reconcilable with our reading of Supreme Court precedent.

(Citations omitted.) *Good Hope Chemical*, 747 F.2d at 812 n.8. Thus, although the court felt constrained to follow Supreme Court precedent, it nevertheless recognized the inequity caused by its own strict adherence to an inflexible rule.

As the above analysis demonstrates, the determination of which conversion rate should be used in converting judgments rendered in United States dollars to foreign currency should be governed by principles of fairness and equity. This is especially true in view of the fact that the distinction gleaned from the *Hicks* and *Die Deutsche Bank* decisions no longer applies in every case.

Manitowoc criticizes this approach on two grounds. First, it believes the court should not be guided by the objective of making the injured party whole under the circumstances here in which the jury found Manitowoc to be less than 50 percent (*i.e.*, 43 percent) at fault. We reject this argument on the basis that, no matter how much Aker contributed to the accident's cause, Aker was nevertheless the injured party. Second, Manitowoc argues that this court's adoption of a flexible rule would allow the parties to manipulate the litigation in order to obtain a more favorable exchange rate. It is highly unlikely, however, that a party would delay the litigation solely for this reason, especially when exchange rates constantly fluctuate and cannot be predicted with exactness. Moreover, in this era of protracted litigation, we do not believe the fear that one party would manipulate the litigation to ensure the most favorable exchange rate is a realistic one. Even if this were a remote possibility, the benefits gained by adopting a flexible rule outweigh the slight chance that a party would use it to manipulate the lawsuit. Should such manipulation occur, the trial court could tailor its ruling to prevent a windfall to either party.

Because this is an action in tort, we must adopt a rule that fulfills the primary goal of making the injured party whole. The application of any other rule would thwart this purpose. The trial court's use of a compromise date does not serve the purpose of making the injured party whole. Nor does it further the policy of adopting a date certain based on the fortuity of the accident in order to assure that neither party can manipulate the amount of the recovery. We therefore follow the lead of other courts that decline to follow old Supreme Court precedent and instead choose the equitable approach.

C. Prejudgment Interest.

The jury separated Aker's repair cost damage award into two components. The first, in the amount of $283,618.03, compensated Aker for parts it purchased from Lampson. The dollar amount awarded matched the total of the Lampson invoices submitted to the jury. The second component

represented the repair costs, including labor and materials, that Aker had incurred in doing some of the repair work itself. That award totaled $383,858.26.

After the jury returned its verdict, Aker requested prejudgment interest on both components of the repair cost award. Following extensive argument on this issue, the trial court determined that Aker was entitled to prejudgment interest on the award representing the Lampson invoices, but not on the award for repair costs incurred internally. On appeal, Manitowoc contends that the trial court's interest award was error. In its cross appeal, Aker argues that the court should have awarded interest on both components of the repair costs.[6]

■ A trial court may award prejudgment interest:

> (1) when an amount claimed is "liquidated" or (2) when the amount of an "unliquidated" claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion.[7]

*Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968). A "liquidated" claim is "one where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." *Prier*, 74 Wn.2d at 32. The rationale is that an injured party should be compensated for the "use value" of money it was forced to spend to cover its loss. A defendant should not, however, be required to pay prejudgment interest on damages when he is unable to ascertain the amount owed. Thus, prejudgment interest may not be awarded when the damages are unliquidated. *Hansen v. Rothaus*, 107 Wn.2d 468, 473, 730 P.2d 662 (1986).

■■ Manitowoc argues that the repair costs were unliquidated because (1) it disputed the evidence upon which

---

[6]The jury also awarded Aker $622,525.54 for its consequential losses. Aker does not claim that it is entitled to prejudgment interest on this amount.

[7]Part (2) does not apply in this case because the plaintiff did not claim an amount due upon a specific contract for the payment of money.

Aker's calculations were based, and (2) the amount of the award was subject to the jury's determination of "reasonable" repair costs. The fact that a dispute exists over all or part of a claim does not make the claim unliquidated. This is true "even though the adversary successfully challenges the amount and succeeds in reducing it." *Prier*, 74 Wn.2d at 33 (quoting C. McCormick, *Damages* § 54 (1935)). The *Prier* court explained:

> *[O]nly those claims would be termed "unliquidated" where the exact amount of the sum to be allowed cannot be definitely fixed from the facts proved, disputed or undisputed, but must in the last analysis depend upon the opinion or discretion of the judge or jury as to whether a larger or a smaller amount should be allowed. . . . [A] claim for $1,000 alleged to have* been in small amounts at different times embezzled by a bank cashier should be considered "liquidated," though the fact and amount of each separate taking is disputed. *In short, it is the character of the claim and not of the defense that is determinative of the question whether an amount of money sued for is a "liquidated sum."*
>
> *It follows from the foregoing that, where the amount sued for may be arrived at by a process of measurement or computation from the data given by the proof, without any reliance upon opinion or discretion after the concrete facts have been determined, the amount is liquidated and will bear interest.*

*Prier*, 74 Wn.2d at 33-34 (quoting C. McCormick § 54). Our courts have reiterated the *Prier* rule that a claim does not have to be agreed upon, stipulated or admitted in order to be liquidated. *Hansen*, 107 Wn.2d at 477-78; *North Pac. Plywood, Inc. v. Access Road Builders, Inc.*, 29 Wn. App. 228, 235, 628 P.2d 482, *review denied*, 96 Wn.2d 1002 (1981). In *Miller v. Badgley*, 51 Wn. App. 285, 296, 753 P.2d 530, *review denied*, 111 Wn.2d 1007 (1988), the court awarded prejudgment interest even though the repair costs were disputed. The court explained that, "[t]he fact that a claim is disputed, in part or in whole, does not change the nature of the claim." *Miller*, 51 Wn. App. at 296. Where damages are easily computed by reference to objective sources, *e.g.*, the property's fair market value, the sum is also liquidated. *Walla Walla Cy. Fire Protec. Dist. 5 v. Washington Auto Carriage, Inc.*, 50 Wn. App. 355, 358-59, 745 P.2d 1332 (1987) (total replace-

ment cost of destroyed fire truck and equipment equaled the amount of the jury's award).

However, when determining the *measure* of damages requires the exercise of discretion by the factfinder, the claim is unliquidated. *Maryhill Museum of Fine Arts v. Emil's Concrete Constr. Co.*, 50 Wn. App. 895, 903, 751 P.2d 866 (since the museum, which was damaged by water leaks, was unique and thus without a market value, the *measure* of damages was left to the trial court's discretion and the damages were therefore unliquidated), *review denied,* 111 Wn.2d 1009 (1988); *Styrk v. Cornerstone Invs., Inc.*, 61 Wn. App. 463, 468-70, 810 P.2d 1366 (damage awards were not liquidated sums because the plaintiffs' various theories of recovery permitted the jury to award amounts different from the principal balances on three notes; thus, the jury's use of the principal balances in determining its award required the exercise of discretion), *review denied,* 117 P.2d 1020 (1991).

*Prier* and subsequent cases support the conclusion that, even though the defendant disputed whether some repairs were necessary and/or whether it caused some or all of the damage, the sum is nevertheless liquidated. Turning to the two components of damages awarded by the jury, the first component clearly represented the total amount of the Lampson invoices. As the trial court noted, Manitowoc did not seriously dispute these repair costs, which were determined by an outside source in the position of a third party adjuster, Lampson. Thus, as in *Walla Walla Cy. Fire Protec.*, these costs were easily ascertainable by reference to an objective source and therefore liquidated.

With respect to the second component of the repair costs, Manitowoc raised in the jurors' minds the question of whether some of the repair costs were actually caused by Manitowoc. As we stated above, the existence of a dispute as to causation does not render the claim unliquidated.[8]

---

[8]Manitowoc also argues that the repair costs were unliquidated because the jury was charged with determining the "reasonable" value of repairs. *See Ski*

However, the second component also included labor costs internally incurred by Aker. Because Aker presented expert testimony to prove its out-of-pocket labor costs, the trial court determined that the hourly rate expended for labor was left to the jury's discretion to determine. We agree with the trial court that there was a genuine dispute as to whether the *measure* of damages should be the internal labor rate or the rate the plaintiff could have charged the customer had the crane not collapsed and delayed the work. Since it was within the jury's discretion to determine a reasonable hourly rate, the labor costs were unliquidated. *See Hansen*, 107 Wn.2d at 476-77 (where reasonable amount for seaman's daily maintenance was determined by the court in the exercise of its discretion, maintenance claim was unliquidated). Therefore, Aker is not entitled to prejudgment interest on the amount awarded for labor costs.

In summary, the portion of the second component of repair cost damages which represents Aker's internally incurred material costs is liquidated, and the other portion of that component, representing Aker's labor costs, is unliquidated. If we could segregate the amounts awarded for materials and labor, Aker would be entitled to prejudgment interest on the amount awarded for material costs. However, there is nothing in the record that segregates the jury's award for labor costs from its award for material costs. In the absence of a special interrogatory or other segregation of

---

*Acres Dev. Co. v. Douglas G. Gorman, Inc.*, 8 Wn. App. 775, 781, 508 P.2d 1381 (1973) (because there was a question regarding the "reasonableness of the cost of repairs", the claim was unliquidated); *Tri-M Erectors, Inc. v. Donald M. Drake Co.*, 27 Wn. App. 529, 537, 618 P.2d 1341 (1980) (jury's award of attorney fees was unliquidated because its reasonableness had to be determined by the jury), *review denied*, 95 Wn.2d 1002 (1981). However, the record indicates that Manitowoc did not dispute the reasonableness of the award; rather, it disputed whether it was liable for some of the repair costs for parts that it did not manufacture. Consequently, the fact that the trial court instructed the jury to determine the "reasonable value of necessary repairs" does not make the damages unliquidated.

the verdict, the trial court properly denied Aker's request for prejudgment interest on the second component of the repair costs award.

We reverse the trial court's ruling on the exchange rate issue and instruct the trial court on remand to apply the date-of-judgment rate and recalculate the damage award accordingly. On the discovery and prejudgment interest issues, the trial court is affirmed.

WEBSTER, A.C.J., and KENNEDY, J., concur.